UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-20631-CIV-LENARD
MAGISTRATE JUDGE P.A. WHITE

HAROLD BROWN,                :

    Plaintiff,           :

v.                           :            <u>REPORT OF</u>
                                      <u>MAGISTRATE JUDGE</u>
JORGE PASTRANA, et al.,      :

    Defendants.          :

_____

### I   <u>INTRODUCTION</u>

The plaintiff in this case, Harold Brown, is a federal prisoner who has been continuously confined at the Federal Correctional Institution in Miami ("FCI Miami") since the commencement of this action. He filed an unsigned complaint (DE#1) which he was ordered to verify (Order DE#4, Verification DE#7). Thereafter, pursuant to Court Order, he was directed to file an superseding amended complaint naming all defendants alleged to be responsible for his alleged injuries, and incorporating in that amended pleading all claims and allegations against them. (Order, DE#9). Brown was granted an extension of time, and then submitted an amended <u>pro se</u> civil rights complaint (DE#12) pursuant to <u>Bivens v. Six Unknown Federal Narcotics Agents</u>, 403 U.S. 388 (1971), raising claims arising from events which took place at FCI Miami on the morning of April 19, 2006, when Brown fell from his bed. [Brown mistakenly says in his complaint and grievances that it was April 18. Institutional records which are exhibits in this case, show, however, that the incident happened at 4:40 a.m., during on the 10 p.m. to 6 a.m. shift bridging April 18-19]. As defendants, Brown named the Federal Bureau of Prisons and two FCI Miami officials, Warden Pastrana and Lieutenant Warren. After a Preliminary Report (DE#14) and Order of partial dismissal (DE#23), the case remained pending only against Warren, on the sole claim that he was deliberately indifferent to Brown's serious medical needs, by allegedly causing delay in provision of medical care for injuries that Brown says he sustained in the fall. All other claims and defendants were dismissed (DE#23).

**This Cause is now before the Court upon defendant Warren's re-
newed Motion for Summary Judgment (DE#52, incorporating his prior
motion filed at DE#27, pp.1-13) with Exhibits 1 and 2 (DE#s 52-2
and 52-3),** as to which Brown filed a Response (DE#55, pp.1-17)
after entry of an Order (DE#38) which informed Brown of his right
to oppose Warren's renewed motion, and provided instructions to
Brown for such a response. (See Order DE#38 at pp.1-2).[1] With his

_____

[1]    Rule 56(c) of the Federal Rules of Civil Procedure provides that
summary judgment is proper

> [i]f the pleadings, depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if any, show that
> there is no genuine issue as to any material fact, and that the mov-
> ing party is entitled to judgment as a matter of law.

In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that
summary judgment should be entered only against

> a party who fails to make a showing sufficient to establish the
> existence of an element essential to that party's case, and on which
> that party will bear the burden of proof at trial.  In such a
> situation, there can be 'no genuine issue as to any material fact,'
> since a complete failure of proof concerning an essential element of
> the non-moving party's case necessarily renders all other facts
> immaterial. The moving party is 'entitled to judgment as a matter of
> law' because the non-moving party has failed to make a sufficient
> showing on an essential element of her case with respect to which
> she has the burden of proof. (citations omitted)

Thus, in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that
summary judgment should be entered only against a party who fails to make a show-
ing sufficient to establish the existence of an element essential to that party's
case, and on which that party will bear the burden of proof at trial.  In such
a situation, there can be 'no genuine issue as to any material fact,' since a
complete failure of proof concerning an essential element of the non-moving
party's case necessarily renders all other facts immaterial.  The moving party
is 'entitled to judgment as a matter of law' because the non-moving party has
failed to make a sufficient showing on an essential element of her case with
respect to which she has the burden of proof. (citations omitted). Thus, pursuant
to Celotex and its progeny, a movant for summary judgment bears the initial re-
sponsibility of informing the court of the basis for his motion by identifying
those parts of the record that demonstrate the nonexistence of a genuine issue
of material fact. This demonstration need not be accompanied by affidavits.
Hoffman v. Allied Corp., 912 F.2d 1379, 1382 (11 Cir.1990).If the party seeking
summary judgment meets the initial burden of demonstrating the absence of a genu-
ine issue of material fact, the burden then shifts to the nonmoving party, to
come forward with sufficient evidence to rebut this showing with affidavits or
other relevant and admissible evidence. Avirgan v. Hull, 932 F.2d 1572, 1577 (11
Cir.), cert. denied, 112 S.Ct. 913 (1992). It is the nonmoving party's burden to
come forward with evidence on each essential element of his claim sufficient to
sustain a jury verdict. Earley v. Champion International Corp., 907 F.2d 1077,
1080 11 Cir.1990). The non-moving party cannot rely solely on his complaint and
other initial pleadings to contest a motion for summary judgment supported by
evidentiary material, but must respond with affidavits, depositions, or otherwise
(continued...)

Response (DE#55) Brown submitted supporting documents, including his own Declaration, administrative grievance documents, medical records, and a sworn Affidavit from FCI Miami Inmate Junior Brown, who is unrelated to plaintiff Harold Brown (DE#55 at pp.18-38). Defendant Warren filed no Reply.

## II     DISCUSSION

In his motion, defendant Warren argues that on several grounds he is entitled to summary disposition, in his favor, of the claim raised against him by plaintiff Brown. First, Warren contends that the complaint is subject to because the inmate plaintiff allegedly failed to fully and timely exhaust his available administrative remedies before filing suit in federal Court, as required under the administrative exhaustion provision of the Prison Litigation Reform Act of 1995 ("PLRA"), which is codified at 42 U.S.C. §1997e(a). Warren alternatively argues that the plaintiff fails to state a claim for deliberate indifference to his serious medical needs, and argues that he is entitled to qualified immunity.

### A.   Exhaustion of Administrative Remedies

### 1.   The PLRA, and Law and Procedures Pertaining to Exhaustion of Administrative Remedies by Federal Inmates

As enacted on April 26, 1996, the PLRA significantly altered a prisoner's right to bring civil actions in forma pauperis, and in pertinent part places new restrictions on a prisoner's ability to

---

(...continued)
to show that there are material issues of fact which require a trial Fed.R.Civ.P. 56(e); Coleman v. Smith, 828 F.2d 714, 717 (11 Cir.1987). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Baldwin County, Alabama v. Purcell Corp., 971 F.2d 1558 (11 Cir.1992). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11 Cir. 1990) (citing Anderson v. Liberty Lobby, Inc., supra).

Pursuant to Brown v. Shinbaum, 828 F.2d 707 (11 Cir. 1987), an Order of Instructions (DE#38) was entered to inform the defendant Warren of his right to file a renewed motion for summary judgment, and to inform the pro se plaintiff Brown of his right to oppose such a motion by Warren if he chose to file it. The Order (DE#38) further instructed plaintiff Brown regarding requirements under Fed.R.Civ.P. 56 for a proper response to such a motion.

seek federal redress concerning the conditions of his confinement. Title 42 U.S.C. §1997e, entitled Suits by Prisoners, provides, in pertinent part, as follows:

> (a) Applicability of administrative remedies
>
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

As discussed below, the administrative exhaustion requirement of §1997e(a) is mandatory; and it is well settled that it applies to claims brought under Bivens, as well as claims raised under §1983. Obrien v. Seay, No. 07-11392, 263 Fed.Appx. 5, at 8, 2008 WL 124424, at *2 (11 Cir., Jan.15, 2008) (citing Alexander v. Hawk, 159 F.3d 1321, 1324 (11 Cir. 1998).[2] As a federal prisoner who has filed suit pursuant to Bivens, the plaintiff Brown's claim of medical indifference cannot be brought against the defendant Warren in his individual capacity in the federal forum unless he has first exhausted his federal administrative remedies under 28 C.F.R. §542.10 et seq., as set out below; and the defendant is correct in arguing that any claims as to which such administrative remedies have not been properly exhausted, would be subject to dismissal pursuant to 42 U.S.C. §1997e(a). Irwin v. Hawk, 40 F.3d 347 (11 Cir. 1994); Irwin v. Quinlan, 791 F.Supp. 301, 302 (S.D.Ga. 1992) (citing Pyles v. Carlson, 698 F.2d 1131, 1132 (11 Cir. 1983)). Both

---

[2]     Under certain circumstances, federal officials, or those acting under color of federal law, may be sued for the deprivation of federal constitutional rights. In Bivens, the Supreme Court established that victims of a constitutional violation by a federal official may recover damages against that official in federal court despite the absence of any statute conferring such right.  Such action is brought pursuant to 28 U.S.C. §1331 and the applicable provisions of the United States Constitution. "The effect of Bivens was, in essence, to create a remedy against federal officers, acting under color of federal law, that was analogous to the section 1983 action against state officials." Dean v. Gladney, 621 F.2d 1331, 1336 (5 Cir. 1980), cert. denied sub nom. Dean v. County of Brazoria, 450 U.S. 983 (1981). Thus, courts generally apply §1983 law to Bivens cases.  Abella v. Rubino, 63 F.3d 1063, 1065 (11 Cir. 1995).

before and following enactment of the PLRA, and the amendment of 42 U.S.C. §1997e, the requirement that a federal prisoner must exhaust his/her remedies available within the prison system before bringing suit in federal court has been held to apply regardless of whether the prisoner's claims seek injunctive relief, monetary relief, or both. Terrell v. Brewer, 935 F.2d 1015, 1019 (9 Cir. 1991); Irwin v. Quinlan, supra; Alexander v. Hawk, 159 F. 3d 1321, 1325-26 (11 Cir. 1998); Massey v. Helman, 35 F.Supp.2d 1110, 1112-14 (C.D.Ill. 1999); Fortes v. Harding, 19 F.Supp.2d 323, 324-26 (M.D.Pa. 1998).

The administrative remedy procedure for federal prisoners to exhaust claims (including Bivens claims) is set forth at 28 C.F.R. §542.10, et seq. See Irwin v. Hawk, 40 F.3d 347, 349, n.2 (11 Cir. (1994); Davis v. United States, et al., No. 07-14639, 272 Fed.Appx. 863, 865, 2008 WL 943594, at *2 (11 Cir., April 9, 2008); Lambert v. United States, et al., No. 05-16607, 198 Fed. Appx. 835, 840, 2006 WL 2468533, at *4 (11 Cir., Aug.28, 2006); Garrett v. DeRosa, et al., No. Civ.A. 05-157(FLW), 2006 WL 561957, at *4-5 (D.N.J., March 2, 2006). The procedure starts with a first step, requiring that the inmate must attempt to informally resolve the dispute in question with the staff at the institution in which he is confined, using a form BP-8 (Administrative Remedy - Informal Resolution). See 28 C.F.R. §542.13. If informal resolution efforts fail to resolve the inmate's grievance, the inmate must then use a three-level process which starts with filing a form BP-9 with the Warden of his institution. From the date of the event complained of there is a 20 day deadline for the inmate to complete the Informal Resolution process, and then submit the formal written Administrative Remedy Request (BP-9) to the Warden. Id., at §542.14. If dissatisfied with the Warden's response to the BP-9, the inmate can appeal within 20 days, using form BP-10, to the Regional Director. Id., at §542.15. If dissatisfied with the Regional Director's response, the inmate can further appeal within 30 days using form BP-11, to the General Counsel in the Bureau of Prisons Central Office. Id. Administrative remedies have not been exhausted until the inmate's claim has been filed at all levels and has been denied at all levels. See 28 C.F.R. §§542.10 - 542.16.

In addition to the procedures discussed, above, the regula-
tions provide that each administrative Request must set forth a
single complaint or a reasonable number of closely related issues.
Id., at §542.14(c). Further, if the inmate includes multiple
unrelated issues in a single Request, the Request will be rejected
and returned without response to the inmate with notice to the
inmate to use a separate Request form for each unrelated issue. Id.

Moreover, regulations provide that an inmate may not raise in
an appeal issues not raised in lower level filings. Id.,
§542.15(b)(2), and may not combine Appeals of separate lower level
responses (different case numbers) into a single appeal. Id.

The Administrative Remedy Coordinator at any level may reject
a Request or Appeal that does not comply with the requirements of
the Administrative Remedy Program. Id., at §542.17.

The kind of claim raised by the plaintiff in this case comes
under the purview of the statute.[3]

The Courts have made clear that §1997e(a), as amended, re-
quires a prisoner to have exhausted those administrative processes
which are available to him before bringing suit on a claim in
federal court. Alexander v. Hawk, 159 F.3d 1321 (11 Cir. 1998);
Booth v. Churner, 532 U.S. 731, 736-41 (2001) (holding that "one
'exhausts' processes, not forms of relief..."); Miller v. Tanner,
196 F.3d 1190, 1193 (11 Cir. 1999) (incarcerated state prisoner
must first comply with the grievance procedures established by the
state department of corrections before filing a federal lawsuit

---

[3]     The types of claims which fall within the purview of the statute are
not limited to physical conditions encountered within the inmate's cell such as
heating or cooling, limited space, or squalor.  The Courts have held that a wide
spectrum of claims constitute "prison conditions" for purposes of §1997e. This
includes allegations of medical indifference. See: Harper v. Jenkin, 179 F.3d
1311 (11 Cir. 1999) (prisoner medical claims); Booth v. Churner, et al., 206 F.3d
289 (3 Cir. 2000) (case involving excessive force by guards; in which the Court
held that for purposes of the PLRA, conditions of confinement-- in addition to
complaints about things such as overcrowding, inadequate medical facilities, and
inadequate law library facilities -- also include denial of food, denial of
heating, and denial of medical attention, because all such actions "affect the
lives of prisoners similarly," and "make their lives worse").

under §1983); <u>Harper v. Jenkin</u>, 179 F.3d 1311, 1312 (11 Cir. 1999) (where a grievance was not timely filed, an appellant must have sought leave to file an out-of-time grievance, and if he has not done so before bringing suit, then his administrative remedies will be considered unexhausted, since to find otherwise would allow inmates to simply ignore the PLRA's exhaustion requirement and still gain access to federal court).

Thus, the Courts have held that satisfaction of the PLRA exhaustion requirement serves as a threshold issue, since the statutory mandate requires an inmate/prisoner must have fully exhausted the administrative remedies/processes which are available to him or her, <u>before</u> bringing suit on a claim in federal court, regardless of the form of relief that the administrative process makes available. <u>See</u> <u>Booth</u>, <u>supra</u> 532 U.S. at 736-41; <u>Higginbottom v. Carter</u>, 223 F.3d 1259 (11 Cir. 2000); <u>Miller</u>, <u>supra</u>, 196 F.3d at 1193; <u>Harris v. Garner</u>, 190 F.3d 1279, 1286 (11 Cir. 1999); <u>Harper</u>, <u>supra</u>, 179 F.3d at 1312; <u>Alexander</u>, <u>supra</u>, 159 F.3d at 1325-26.

The Eleventh Circuit and Supreme Court have outlined policy concerns underlying the exhaustion requirement, which are served when inmates are not permitted to simply ignore the PLRA's exhaustion requirement, and yet gain access to federal court.[4]

---

[4]    The Eleventh Circuit has described seven policy reasons for favoring an exhaustion requirement: (1) to avoid premature interruption of the administrative process; (2) to let the agency develop the necessary factual background upon which decisions should be based; (3) to permit the agency to exercise its discretion or apply its expertise; (4) to improve the efficiency of the administrative process; (5) to conserve scarce judicial resources, since the complaining party may be successful in vindicating rights in the administrative process and the courts may never have to intervene; (6) to give the agency a chance to discover and correct its own errors; and (7) to avoid the possibility that frequent and deliberate flouting of the administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures. <u>Alexander v. Hawk</u>, <u>supra</u>, 159 F.3d at 1327; <u>Johnson v. Meadows</u>, 418 F.3d 1152, 1156 (11 Cir. 2005). The Supreme Court, in 2002, observed that the current exhaustion requirement under §1997e(a) was designed to reduce the quantity and improve the quality of prisoner suits, and affords corrections officials an opportunity to address complaints internally before allowing the initiation of a federal case; and in some instances, corrective action taken in response to a grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation. <u>Porter v. Nussle</u>, 534 U.S. 516, 516-17 (2002). The Court further noted that in other instances, the internal review might filter out some frivolous claims; and for cases ultimately brought to court, an administrative record clarifying the controversy's contours could facilitate adjudication. <u>Id</u>. at 517.

Even when an inmate argues that it would be futile for him to attempt to exhaust the administrative processes which are available as part of an established inmate grievance procedure, that does not excuse the inmate/plaintiff's failure to comply with the statutory requirement that he do so.[5]

In this case, the defendant Warren argues that inmate Brown failed to exhaust his available administrative remedies before bringing this <u>Bivens</u> action in federal court. In support of this

---

[5]  The term "available," as used in Section 1997e(a), does not mean that inmates must only exhaust their administrative remedies if the type of relief they seek is "available" within the administrative apparatus; instead, the term means that a prisoner must exhaust all administrative remedies that are available before filing suit, regardless of their adequacy. <u>Alexander v. Hawk</u>, <u>supra</u> at 1325-26; <u>Harris v. Garner</u>, 190 F.3d 1279, 1286 (11 Cir. 1999). This means that an inmate who is seeking money damages as relief from defendants in a lawsuit must exhaust all of his administrative remedies before filing suit, even if money damages are not available as relief through the jail or prison grievance procedure. <u>Alexander</u>, <u>supra</u>; <u>Moore v. Smith</u>, 18 F.Supp.2d 1360, 1364 (N.D.Ga. 1998). The Supreme Court has explained that "available" refers to the "possibility of some relief for the action complained of." <u>Booth v. Churner</u>, 532 U.S. 731, 738 (2001); <u>Hall v. Richardson</u>, 144 Fed.Appx. 835, 836, n.2 (11 Cir. 2005) (citing <u>Booth</u>, for the Court's definition of "available" in the context of §1997e(a)).

The Eleventh Circuit has held that "the judicially recognized futility and inadequacy exceptions do not survive the new mandatory exhaustion requirement of the PLRA," <u>Alexander v. Hawk</u>, <u>supra</u>, 159 F.3d at 1325-26; <u>Harris v. Garner</u>, 190 F.3d 1279, 1286 (11 Cir. 1999). Where exhaustion is now a precondition to suit "the courts cannot simply waive those requirements where they determine that they are futile or inadequate," since "such an interpretation would permit an enormous loophole in the PLRA which Congress clearly did not intend," and because "[m]andatory exhaustion is not satisfied by a judicial conclusion that the requirement need not apply," <u>Alexander</u>, <u>supra</u>, at 1326 [<u>citing</u>, <u>Weinberger v. Salfi</u>, 422 U.S. 749, 766 (1975) (holding that where exhaustion is a statutorily specified jurisdictional prerequisite, "the requirement...may not be dispensed with merely by a judicial conclusion of futility")]. <u>Cf.</u> <u>Qawi v. Stegall, et al.</u>, 211 F.3d 1270 [table case, published on Westlaw], No. 98-1402, 2000 WL 571919, at *1-2 (6 Cir. (Mich) May 3, 2000) (Circuit Court affirming district Court's dismissal of the complaint for lack of exhaustion, and noting that the dismissal was appropriate even though by time of the appeal the plaintiff's administrative remedies might have become time-barred) (citing <u>Hartsfield v. Vidor</u>, 199 F.3d 305, 309 (6 Cir. 1999); and <u>Wright v. Morris</u>, 111 F.3d 414, 417, n.3 (6 Cir. 1997)). Even an inmate's transfer from an institution does not remove the requirement that he/she pursue and exhaust administrative remedies concerning events which occurred at the institution prior to the inmate/prisoner's transfer. <u>See</u> <u>Hall v. Richardson</u>, 144 Fed.Appx. 835, 836, n.2 (11 Cir. 2005) (in case where plaintiff argued on appeal that he could not exhaust his administrative remedies because he was transferred from the institution where the alleged violations occurred, that he could no longer pursue exhausting his remedies through the administrative process, and that the transfer should be deemed to have removed the exhaustion requirements, the Appellate Court, upon affirming the district Court's dismissal pursuant to §1997e(a), rejected the plaintiff's arguments, and in doing so noted that incidents he complained of had occurred in December 2000 and December 2001, but he was not transferred until February 28, 2002, and therefore he had not exhausted his administrative remedies when he had the opportunity to do so).

contention, Warren in his incorporated summary judgment motion (DE#27, p.5) relies on Wombacher's Declaration, and attachments thereto. Warren argues that "Brown did not file an administrative claim to redress the allegations he raised against Lt. Warren in the instant complaint." (Id., Motion at p.5). Defendant Warren further states, "[t]he plaintiff did not avail himself of the available administrative procedure necessary to satisfy the exhaustion requirement regarding his allegation of Lt. Warren's deliberate indifference on April 18 [sic], 2006 by timely filing a BP-9 about Lt. Warren's conduct within 20 days of the event." (Id., Motion, at p.5). In her Declaration (Defendant's Ex.1, at DE#52-2), Wombacher summarizes the BOP Administrative Remedy Program, already discussed above, entailing use of forms BP-9, BP-10, and BP-11, (Id. at p.2), and briefly outlines inmate Brown's use of those procedures during the course of his federal incarceration. Wombacher states that the BOP SENTRY System, which tracks administrative grievances, shows that Brown filed Remedy Requests in January 2004 and January 2009 which are totally unrelated to this case. Wombacher further states that Brown also filed a Remedy Request, #413675 in May 2006, which she couches as a Request for an MRI. (DE#52-2, p.3). Wombacher states that the first two administrative remedies (from January 2004 and May 2006) "have been Exhausted." (Declaration at ¶6, DE#52-2, p.3). Examination of the record reveals that the May 2006 Administrative Remedy Request was related to inmate Brown's April 2006 accident. Attached to the Wombacher Declaration (which is Defendant's Ex.1) is a Composite Exhibit 1, consisting of 10 pages labeled Exs. 1a through 1j (DE#52-2 at pp.4-13). Careful examination of the Exhibits 1a to 1j, which are not in chronological order, reveals that they are administrative remedy documents (including inmate requests and BOP responses) covering inmate Brown's use of the administrative remedy process at all four levels (Informal Resolution, BP-9, BP-10, and BP-11), and shows that they relate to Brown's April 19, 2006 fall [he says April 18] and his concerns about care and diagnosis of his injuries.

The Informal Resolution document (Ex.1d) shows that Brown dated it 4/29/06, 11 days after the fall. He asked for an MRI, to identify the problem with his back and elbow, because his pain was

not subsiding, and an X-ray "failed to detect the problem." He stated that he discussed the matter with his counselor, and medical staff, to no avail. The counselor's written comment, dated 5/9/06 read: "Spoke to inmate. Inmate wishes to file administrative [illegible]." Notations at the bottom of the form indicate that the "attempted informal resolution with inmate by counselor" was on 5/9/06 at 2 p.m., and contains an entry dated 5/9/06 at 2:05 p.m., stating "BP(9) given to Inmate."

Next, it appears from the record that Brown filed a BP-9, dated "5-8-06" directed to the Warden. (See Ex. 1b, at DE#52-2, p.5).[6] That formal Request (BP-9) both begins and ends with a

_____

[6]      As discussed, supra, the defendant has alleged in pertinent part that as to the claim against Warren Brown's administrative remedies are unexhausted, because he did not avail himself of the available procedures "by timely filing a BP-9 about Lt. Warren's conduct within 20 days of the event." [Emphasis added]. This argument can be construed as asserting either of two things: 1) Brown did not timely file his May 2006 BP-9, or 2) he did not file a BP-9 making a claim/complaint about the defendant Officer Warren's actions.

         **The question of the timeliness of Brown's May 2006 BP-9 will be addressed, here, in this footnote, immediately below.**

         (The issue of whether Brown's administrative filings included a complaint to BOP officials about the same alleged actions/omissions by Warren which form the basis for the Bivens claim against him, is discussed further below, at pp. 10-15 of this Report).

         The Court notes that 5/8/06 [the date on Brown's form BP-9 filed as Defendant's Ex.1b] was precisely 20 days from 4/18/06 [the date Brown said his fall occurred], but 19 days from 4/19/06 [the actual date of the incident that gave rise to Brown's claims]. The Court further notes that if May 8 was the true date on which Brown's BP-9 was completed and signed, then he cannot have used the BP-9 form handed to him by the Counselor responding to the Informal Resolution, since the record (Ex.1d) shows that the "Attempted Informal Resolution with the inmate" and the provision to him of a BP-9 form by the Counselor participating in the Informal Resolution occurred on May 9. For the purposes of this proceeding, the Court will take as true that Brown's BP-9 was actually signed on May 8, and that he did not "back date" a form handed to him by the Counselor on May 9, simply to ensure that he [Brown] was meeting the 20 day filing deadline [based on Brown's mistaken assumption that the incident occurred on April 18]. From this, however, it necessarily follows that Brown proceeded to the filing of his BP-9 one day before completion of the Informal Resolution Process. This, then begs the question whether there was a procedural default. (The Eleventh Circuit has held that 1997e(a)'s exhaustion requirement contains "a procedural default component" -- that is, that "[p]risoners must timely meet the deadlines or the good cause standard of [the applicable] administrative grievance procedures before filing a federal claim." See Johnson v. Meadows, 418 F.3d 1152, 1159 (11 Cir.2005)). The record shows that after his fall Brown actually wasted 10 of the
(continued...)

statement by Brown: "<u>I am incorporating the attached page in support of this complaint</u>." In the body of the BP-9 request the remedy Brown sought was the taking of an MRI ("since I continue to have elbow and excruciating back pain, and at times, can't move, I am requesting an MRI to be taken to determine the extent of the damage"). The attachment appears immediately behind Ex. 1b, at Ex. 1c. It describes Brown's fall (at 4:40 a.m.); attempts for an estimated 30 minutes to summon help by banging on the cell door; and response to the cell by a Corrections Officer (CO Irisario [sic -- Irizarry],[7] not a named defendant to whom Brown explained his fall and pain. It also includes Brown's statement that Irizarry contacted Lt. Warren, and includes Brown's statement that thereafter he had to wait for medical care. Specifically, that portion of the Attachment to the BP-9, which incorporates the basis for Brown's <u>Bivens</u> complaint against Warren, reads, as follows, *verbatim*:

> Officer, Irisario [sic], contacted Lt. Warren who instructed the Officer Irisario [sic] to advise me to wait and go to sick call in the morning. Although Lt. Warren did not visually examine me in order to properly determine my condition, whether it be non-emergency or emergency; he made a determination not to take me to the hospital. This caused undescribable suffering.

> This suffering continued for what seem like hours, as I was force to lay on the floor until the shift change. When Lt. Rodriguez came on, he came over and saw my condition. He immediately order that I be placed on a stretcher, and taken to the hospital...

_____

(...continued)
20 days allotted to complete Informal Resolution and file a BP-9, because he did not submit his Informal Resolution until 4/29/06 [10 days after his 4/19 fall]. Under the code provisions, Brown presumably was required to first complete the Informal Resolution process, and only then file his BP-9. Although BOP officials, under 28 C.F.R. §542.17 theoretically could have rejected Brown's BP-9, as being prematurely filed, because he submitted it before completion of the Informal Resolution process, they did not do so. Accordingly, there appears to have been no procedural default applicable in these summary judgment proceedings, in connection with the filing of Brown's BP-9, either relating to prematurity, or the filing deadline.

[7]     Departmental Records (a Log Book, at DE# 53-3, p.5) indicate that the officer's correct name was Irizarry. He has been referred to by the plaintiff by the names Irisario, and Irrizari.

(Ex.1c, DE#52-2 at p.6). In the body of the BP-9 there was no request by inmate Brown relating to defendant Lt. Warren's alleged omission/failure to act [e.g., Brown did not request that Lt. Warren be formally or informally admonished/sanctioned for his alleged failure to get him immediate medical care]. Nor was there any such request in the Attachment [Ex.1c] alleging what Warren had done/failed to do. The BP-9 was denied by the Warden on 6/3/09. It is clear from the Warden's response that the BP-9 was perceived as a request for an MRI. The Warden's response began by stating: "This is in response to your Administrative Remedy dated May 8, 2006, in which you are requesting to have an MIR of the back and elbow." The Warden's response then summarized medical care given for pain, and x-ray results [including that in the "lumbosacral spine" there was "some minimal narrowing of L4-L5 without changes of the intervertebral discs"], and listed dates on which Brown was evaluated and treated. The response closed with the Warden's statement: "Based on the above action, your Request for Administrative Remedy is denied." [Ex.1a, at DE#52-2, p.4).

Thereafter, Brown filed a BP-10 Regional Appeal dated 6/28/06 (see Ex. 1e)[8] stating ("see attachment")[emphasis added], and requesting that the Warden's denial [of his BP-9] be rejected, and that he be "instructed to order an MRI which could further alucidate [sic] the injury." The BP-10, like the BP-9, did not seek a remedy directed against Lt. Warren. It appears, however, that the "Attachment" referenced by Brown in the BP-10 is Defendant's Ex. 1g [with the word "ATTACHMENT" written at the bottom] which is a copy of the same document that Brown appended to his BP-9 complaining *inter alia* about delay of care allegedly caused by Lt. Warren. [Compare Defendant's Exs. 1c and 1g, at DE#52-2, pp.6 and 10]. The record shows that the 7/28/06 Response to Brown's BP-10 [Defendant's Ex. 1e, at DE#52-2, p. 8] was written "for informational purposes only." It neither granted nor denied the BP-10. In brief, the Response noted that physical examinations and radiological

---

[8]    Note, the copy of the BP-10 filed as Defendant's Ex.1f [which consists of only one page] is undated. A dated copy of the BP-10 Appeal appears attached to plaintiff's Original Complaint (DE#1, at p.16).

studies failed to show the need for additional diagnostic interven-
tions, observed that medical staff were aware of his condition
which appeared to be stable, and stated that "[i]f it is determined
that further intervention is necessary, an appropriate referral
will be arranged." (Id.). The BP-10 Response advised Brown of his
right to appeal to General Counsel at the Central Office. (Id.).

Finally, the record shows that inmate Brown filed a two-page
"Central Office Administrative Remedy Appeal" (BP-11) dated
8/21/06, which opened with Brown's statement: "Harold Brown,
Appeals the Regional Director affirmation of the Warden's June 13,
decision denying his request for Administrative Remedy requesting
a MRI of the back and elbow." (See Defendant's Ex.1i, at DE#52-2,
at p.12). At the bottom of page 1 of his BP-11, Brown wrote:
"(CONTINUED TO ATTACHMENTS)."  In the body of the BP-11 document
Brown set out his summary of what was stated by the Warden and
Regional Director in their responses. Brown, seizing upon the
Warden's reference to narrowing of the Lumbosacral spine, continued
by arguing/concluding in his BP-11 that "Thus, a MRI is Proper."
Brown also challenged the statement that he was "stable," arguing
that he "cannot maintain" his "daily functioning activities," and
as examples states that he now walks with a cane, is assigned to a
job at which he sits to do his work [folding napkins], and that he
cannot "workout" like he did before [i.e. doing "dips, pullups,
etc."]. Brown concludes his BP-11, stating "Based on the above, the
MRI should be ordered." As was true with the written text in the
bodies of his completed BP-9 and BP-10 forms, Brown made no
reference to Lt. Warren in the body of his BP-11. Nor did he seek
a specific remedy directed to Lt. Warren in the BP-11.  He only
asked that a diagnostic MRI be performed.

Notwithstanding Brown's failure to request relief against Lt.
Warren in his administrative filings, it is clear that he appended
to his BP-9 and BP-10 the Attachment complaining that he was
subjected to delay of medical care, and suffered pain during the
period of delay, due to Warren's alleged failure to order that he
[Brown] be immediately taken to the hospital as soon as Warren

13

learned that he had fallen.  It appears that the administrative
remedy [BP-9] and Regional Appeal [BP-10] -- which were affirmed by
at the national level [by Response to the BP-11] -- therefore
included multiple issues [Lt. Warren's failure to act, i.e. denial
or delay of medical care], and staff's alleged subsequent failure
to give plaintiff Brown proper medical care [i.e., refusal of an
MRI to diagnose what else was wrong with Brown, when according to
him his X-rays were "inconclusive" and he continued to be in pain].

      It  appears  that  these  claims  constitute  "closely  related
issues," as contemplated by 28 C.F.R. §542.14(c)(2), which permits
an inmate to "place a single complaint or a reasonable number of
closely related issues on the form." Here, the complaint against
Warren voiced in the Attachment incorporated in the BP-9 and BP-10,
and the issue of subsequent denial of an MRI, both relate to the
same fall and injury. Moreover, the fact that the BP-9 and BP-10
were answered, rather than being "rejected and returned without
response," as provided for under §542.14(c)(2), supports a conclu-
sion that the Request for Remedy (BP-9) followed by the BP-10
Appeal did not contain "too many" or unrelated issues. [This is
because the Code provides that a decision maker at each level of
the administrative process is empowered to reject any Request or
Appeal that does not comply with the requirements of the Adminis-
trative Remedy Program, see §542.17; and no rejection of a Request
or Appeal by Brown occurred in this case]. It appears that,
although inmate Brown did not specifically request a remedy or
sanction against Warren for his alleged failure to act, the
inclusion with and incorporation in his BP-9 and BP-10 of the
Attachment complaining that Warren caused delay of medical care,
served to do what Congress contemplated when it enacted the PLRA
exhaustion requirement (i.e., it put BOP administration on notice
that Warren allegedly caused Brown harm, and thereby gave them the
opportunity to develop factual background relating to Brown's
complaint upon which decisions should be based, and gave the agency
a chance to determine if there was an error and the opportunity to
take corrective action - which Congress contemplated could possibly

14

forestall federal litigation on a claim referenced in a grievance. See Footnote 4 of this Report, supra, and related text).

It therefore appears that, on the asserted ground of failure to exhaust administrative remedies, the defendant Warren's renewed motion for summary judgment (DE#52, incorporating DE#27) should be denied.

### B. The Defenses of Plaintiff's Failure to State a Claim for Medical Indifference; and of Defendant's Entitlement to Qualified Immunity

Having determined that the complaint should not be dismissed for failure of the plaintiff to exhaust his available administrative remedies, it will be presumed that the Court has jurisdiction to address the complaint on the merits, and the discussion will turn to the defendant's other asserted defenses.

Careful review of the record before the Court, which includes the amended complaint, defendant Warren's motion and his exhibits including his Declaration (Ex.2, at DE#52-3), and the plaintiff's Response and Exhibits (at DE#55), clearly demonstrates that Warren is entitled to summary disposition, in his favor, of the medical claim raised against him.

### 1. Evidence Based on the Parties' Exhibits

The gravamen of inmate/plaintiff Brown's medical indifference claim against Lt. Warren, who is the only defendant remaining in the case, is that Warren was deliberately indifferent to his serious medical needs because a housing officer called and informed him that Brown had fallen from his bunk to the floor, and Lt. Warren did not take steps to have the plaintiff taken to the hospital or for him to be immediately seen by medical staff.

Plaintiff Brown alleges that he fell from his bunk at about 4:40 a.m., when he awoke and wanted to use the toilet. Brown asserts that, to no avail, he attempted to get the attention of an officer on his unit for approximately ½ hour, by banging on his cell door. This allegation by Brown is not disputed, and it is

supported by the inmate Junior Brown's Affidavit (DE#55, pp.37-38). Although Junior Brown does not state in his Affidavit that he was plaintiff Harold Brown's cell mate (see Id.), Harold Brown makes it clear in his own Declaration (DE#55, at p.20) that he and Junior Brown were housed together in a triple cell on Unit C, along with inmate Lazaro Zans. Plaintiff Brown's Declaration, and Junior Brown's Affidavit make clear that it was Junior Brown, not the plaintiff, who banged on the cell door. Plaintiff states there was only one unit officer to cover two units (Units C and D), and that CO "Irrizari" [Irizarry] did not respond because he was on Unit D.

Plaintiff Brown states in his Declaration that at about 5:00 a.m. Irizarry responded to the cell door, and he told him he couldn't move, and was in extreme pain. Brown says that Irizarry used a radio to inform staff elsewhere in the institution that an inmate had fallen, and Brown states that he heard Warren's voice instructing Irizarry to "call him." According to the Plaintiff, Irizarry left, but returned about 10 minutes later to announce that that he told Lt. Warren about the fall, and that he informed Warren of plaintiff's injuries. Plaintiff states that Irizarry said that Warren stated he would "notify relief" when they arrived. [Affiant Junior Brown references only one visit by Irizzary to he cell, at about 5:10 a.m. He states that he heard Irizzary say he would contact the Lieutenant [Warren]. It is Junior Brown's statement that after "attempting to contact Lieutenant Warren" Irizarry said that Warren said "nobody was at the hospital at this time." Junior Brown states that at the shift change, Officer Paicely relieved Irizarry at about 6:00 a.m., and came to the cell, where he noted that Harold Brown was still on the floor. Junior Brown, plaintiff's cell mate, was in a position to observe this first hand.

Junior Brown also states that Officer Paisley, after checking Brown, called the hospital, and that he [Paicely] received a response at about 7:00 a.m. [There is no indication in Junior Brown's statement, that he was present for Paicely's phone call to the hospital, and is competent to give testimony regarding that call, and the time that the hospital answered].

According to Plaintiff, as stated in Plaintiff's Declaration, it was Irizarry's stated opinion that Warren didn't care whether he needed emergency care. (Plaintiff, however, does <u>not</u> state that Irizarry said that he heard Warren say that he did not care about plaintiff's injuries and/or needs; the plaintiff does not state that he heard what Warren said; and there is no declaration or affidavit from Irizarry concerning what he told Warren, or what Warren said to him). It is undisputed that it was Lt. Warren's stated conclusion/decision that staff was to be alerted at the 6:00 a.m. shift change, and that the plaintiff should wait to be seen by medical staff at sick call at the beginning of the next shift. According to plaintiff's declaration, at about 6:05 a.m., Officer Paicely arrived at the cell, observed him on the floor, and immediately contacted Lt. Rodriguez, the "newly arrived" Operation Lieutenant, who came to his room within minutes after Paicely's call. According to the plaintiff, the Physician's Assistant, Rosa Almenaque went to his room, assessed his injuries, and had him removed on a stretcher and taken to the prison medical clinic for care and treatment. The medical record attached to Plaintiff Brown's Declaration makes clear that he was seen by prison medical staff by 6:32 a.m. at his cell. The Log book indicates his removal from the cell by stretcher, to the medical department, at 6:42 a.m.

Institutional records, consisting of entries in the prison Log Book, submitted as exhibits to Warren's Declaration (at DE#52-3, pp.4-6) and as exhibits to Plaintiff's Response (DE#55, at pp.31-33) shed light on the sequence of events. They indicate that: an inmate Count was conducted at 3:00 a.m., resulting in a "good count" [144 inmates]; that at 4:00 a.m. 6 inmates were awakened [apparently for transfer]; that at 5:00 a.m. an inmate Count was conducted, resulting in a "good count" [138 inmates]. The Log Book entries then indicate that it was at 5:30 a.m. that Lt. Warren was informed of plaintiff's fall,[9] that the shift ended at 6:00 a.m.,

---

[9]     The Log Book entries read, in pertinent part, as follows:

5:30 AM    Lights On & Cell Doors Open / Lt Warren Informed of Note:

(continued...)

that "T. Paicely" and "OPS Lt. Rodriguez" assumed duty at 6:00 a.m., and received all necessary equipment. The Log further states that at 6:05 a.m. fire and security inspections were commenced; at 6:15 a.m. the PA [Physician's Assistant] was "notified ...about I/M Brown #42883-004, falling from the bunk;" and at 6:42 a.m. "I/M Brown, #42883-004 [was] escorted to medical on stretcher."

Finally, there is defendant Andre Warren's sworn Declaration for the Court's consideration.  Warren states therein that he was working the 10:00 p.m. to 6:00 a.m. shift, that ended on the morning of April 19, 2006. He was Operations Lieutenant on that morning watch shift, and went off duty at 6:00 a.m. of April 19. In his capacity as Operations Lieutenant he was "charged with the responsibility of ensuring the security and orderly operation of the institution." The Unit Officers assigned to the various housing units, however, were responsible for conveying information to him regarding their particular units. (Declaration at ¶3, DE#53-3, p.2). More specifically, Warren states that "if an issue arose in a housing unit, the Unit Officer, is responsible for notifying me of the matter." (Id.). Warren states in his Declaration that he recalls a call from a Unit Officer about an inmate who claimed to have fallen from a top bunk bed. (Id., at ¶4). Warren states: "I recall that I received the call some time after 5:30 a.m." (Id.). Warren states that, "as a matter of course, when I receive calls from Unit Officers, I inquire of them sufficient information upon which to make a decision." (Id.).  He also states that in this case, "Consistent with my practice, I asked the Unit Officer about the inmate's condition and whether medical attention was needed." (Declaration, ¶4, DE#52-3 at pp.2-3). Warren further states that "The Unit Officer did not advise me that the inmate had any injuries" (Declaration, at ¶4, DE#53-3, p.3), and, accordingly, Warren states that "Based on the officer's report, I determined that the inmate could wait until medical staff arrived at the institution."

---

(...continued)

NOTE:        Inmate Brown, H #42883-004 complained he fell from top bunk. I. Ofc. Irizarry informed the inmate to report to Sick Call, see PA.

At 6 AM      END OF SHIFT

Warren concludes by stating that "I made this decision based on the lack of reported injuries, and the fact that medical staff were due to arrive a the institution shortly." (<u>Id.</u>).  Warren notes that his statements are affirmed by the entries in the Log Book for Coral Unit (<u>Id.</u>, at ¶5). He also states that "Prior to leaving the Institution that morning, I informed the oncoming Physician's Assistant of the incident and the inmate's need to be seen" (<u>Id.</u>, Declaration, at ¶6). Warren adds that "Contrary to the inmate's allegation, I did not leave him on the floor in pain for hours," noting he was only informed about the incident in question at about 5:30 a.m. (<u>Id.</u>, at ¶7). Finally, Warren states that "Given that medical staff was scheduled to arrive shortly, I advised the Unit officer to have the inmate wait until the medical staff arrived." (<u>Id.</u>).

## 2.   Law Relating to Deliberate Indifference, and Denial/Delay of Medical Care

The Eighth Amendment's prohibition on cruel and unusual punishment imposes a duty on prison officials to provide prisoners with "humane conditions of confinement," including adequate medical care. <u>Farmer v. Brennan</u>, 511 U.S. 825, 832-34 (1994). The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment. <u>Farrow v. West</u>, 320 F.3d 1235, 1242 (11 Cir. 2003). It is a showing of prison official's deliberate indifference to an inmate's serious medical need that constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976). Generally, a serious medical need is considered "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11 Cir. 2003) (quoting <u>Hill v. Dekalb Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1187 (11 Cir. 1994)). Such claims are not limited to medical staff, but may also arise based on acts/omissions of other prison personnel. On a claim that a guard impeded access to medical care, the inmate must provide, for example, evidence that the guard intentionally delayed or denied medical care, without explanation, for a serious medical condition

that was known or obvious to the guard, <u>Estelle v. Gamble</u>, <u>supra</u>, 429 U.S. at 104; <u>Brown v. Hughes</u>, 894 F.2d 1533, 1538 (11 Cir. 1990). Even where an inmate has sustained a serious injury, however, a defendant corrections officer or medical staff member may be entitled to summary judgment where the plaintiff offers no evidence that the defendant was aware of his injury, or that the defendant was subjectively aware of a serious risk of harm.[10]

Thus, to show that a prison official acted with deliberate indifference to his serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry. <u>Farrow</u>, 320 F.3d at 1243 (citing <u>Taylor v. Adams</u>, 221 F.3d 1254, 1257 (11 Cir. 2000)). First, the plaintiff must present evidence of an objectively serious medical need [i.e., one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention]. <u>Id.</u> In either situation, the medical need must be one that, if left unattended, poses a substantial risk of serious harm. <u>Id.</u> Second, the plaintiff must prove that the prison official acted with an attitude of deliberate indifference to that serious medical need. <u>Id.</u> Deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." <u>McElligott v. Foley</u>, 182 F.3d 1248, 1255 (11 Cir. 1999).

Crucial to establishing an "unnecessary and wanton infliction of pain" is some proof that officials acted with specific intent. The exact nature of the specific intent required depends on the type of claim at issue. <u>Campbell v. Sikes</u>, 169 F.3d 1353, 1363, (11 Cir.1999). This specific-intent requirement for an Eighth Amendment

---

[10]   <u>See</u> <u>Farrow v. West</u>, <u>supra</u>, 320 F.3d at 1248 (Nurse, alleged in the complaint to have ordered her staff not to provide medical care, was entitled to summary judgment where the prisoner plaintiff failed to submit evidence that the nurse was herself subjectively aware of a serious risk of harm to the plaintiff); <u>Brown v. Hughes</u>, <u>supra</u>, 894 F.2d at 1539 (with respect to claim relating to delay in treatment of a serious injury [a broken foot], 2 nurses, a corrections officer, and the Sheriff were entitled to summary judgment where the plaintiff's affidavits and other evidence failed to show that they were aware of his injury on the day that it occurred).

violation applies to claims of medical indifference. Campbell, supra, 169 F.3d at 1363-64.

As the Eleventh Circuit in Campbell v. Sikes observed, the Supreme Court in Wilson v. Seiter, 501 U.S. 294 (1991), and later Farmer v. Brennan, has "refined the inquiry" regarding satisfaction of the subjective element required for an Eighth Amendment deprivation. Campbell, supra, 169 F.3d at 1363. The Supreme Court explained in Wilson, that the Eighth Amendment applies only to punishments, and that prison conditions are only punishment if a mental element of punitive intent is shown, Wilson, supra, 501 U.S. at 300 ("If the pain inflicted is not formally meted out as punishment by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify"). In Farmer, the Court provided further explanation of the mental state that is required for deliberate indifference, Farmer, supra, 511 U.S. at 837-38 (holding that a prison official cannot be found liable under the 8th Amendment for denying an inmate humane conditions unless he knows of and disregards an excessive risk to inmate health or safety; and he must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and the defendant must also draw the inference).

As the Eleventh Circuit has noted post-Farmer, proof that the defendant should have perceived the risk, but did not, is insufficient. Campbell supra, at 1364 (citing Farmer, at 838); Cottrell v. Caldwell, 85 F.3d 1480, 1491 (11 Cir.1996) (the official must have a subjectively "'sufficiently culpable state of mind,'" and "[t]here is no liability for 'an official's failure to alleviate a significant risk that he should have perceived but did not...'") (quoting Farmer, supra, 511 U.S. at 834, 838).  Liability may be imposed for deliberate indifference only if the plaintiff proves the defendant actually knew of "an excessive risk to inmate health or safety" and disregarded that risk." Campbell, supra, at 1364 (citing Farmer, at 837).

### 3.  Analysis

As noted _supra_, the evidence is undisputed that plaintiff Harold Brown fell from his bunk at about 4:40 a.m. on the morning of April 19, 2006, that he apparently laid on the floor while his cell mate, Junior Brown, banged on the cell door for approximately a half hour, attempting to get the attention of the Unit officer (Irizzary) who did not respond immediately because he was not on C Unit, but instead was attending to matters on D Unit.  The record indicates that a some point in time the plaintiff was given a pillow to place under his head.

The inmates Brown indicate that at about 5:00 or 5:10 a.m., Irizzary came to their cell on C Unit, and said that he was going to communicate with Lt. Warren. It is undisputed that Warren was elsewhere in the institution. According to the witness Junior Brown, Irizzary came to the cell at about 5:10 a.m.  According to the plaintiff, Irizzary came to the cell twice, once at about 5:00 a.m., at which time he allegedly radioed Lt. Warren to report that an inmate had fallen; and Irizzary allegedly was instructed by Warren to call him to further discuss the situation. Plaintiff Brown asserts that Irizzary then returned about 10 minutes later, to state that he had spoken with Lt. Warren, and that he [Irizzary] was instructed that the oncoming relief officers would be informed, and that inmate/plaintiff Brown should wait until the shift change to see the medical staff who were coming on duty at 6:00 a.m.

Documented evidence, established by regularly kept prison records [the Coral Unit Log Book], which is substantiated by Warren's Declaration, indicates that it was actually not until 5:30 a.m. that Lt. Warren was informed of inmate Brown's reported fall from his bunk. The record demonstrates that thereafter Irizzary informed the inmate to report to sick call and see the Physician's Assistant. The plaintiff's cell mate, Junior Brown, states that Irizzary was at the cell at about 5:10 a.m. and at that time Harold Brown told Irizzary that he fell. Junior Brown states that Lt. Warren said he would talk to the Lieutenant, and then [apparently having left the cell to speak with Lt. Warren, and then having returned to the cell] told Harold Brown, in Junior Brown's

22

presence, that medical staff was not yet on duty. Junior Brown does not state at what time Lt. Warren was actually contacted and informed of the reported fall. Nor does Junior Brown state at what time Irizzary returned to inform Harold Brown, in his [Junior Brown's] presence, that he had spoken with Warren.

At best, there is disagreement about what time Lt. Warren was informed that Harold Brown had fallen. The witness, Junior Brown, does not fix a time at which Irizzary returned to say that he had spoken to Warren. The defendant Warren states, with supporting ins-titutional documentation, that it was not until 5:30 a.m. Plain-tiff Harold Brown, who was not privy to the Irizzary-Warren call [i.e., was not present to overhear it] fixes the time of notice to Warren approximately 20 minutes earlier, at about 5:10 a.m.

The plaintiff who was not present for the Irizzary-Warren call, does not know what was said. Regardless of whether Irizzary called Lt. Warren at 5:10 a.m., or 5:30 a.m., the evidence proffered by Warren [via his sworn Declaration], which is not rebutted by the plaintiff,[11] indicates that Warren asked the reporting Unit Officer [Irizzary] about Harold Brown's condition, and whether medical attention was needed. Warren states that because the Unit Officer [Irizzary] did not tell him that Harold Brown had any injuries, he determined, based on Irizzary's report, that Brown could wait until medical staff arrived at the institution at 6:00 a.m. [50 minutes later, according to the plaintiff; and 30 minutes later according to the defendant]. The decision by Warren was made because of lack of information indicating to him that Brown was injured and needed urgent medical care. Warren establishes through his Declaration that as he exited from the institution at 6:00 a.m., and the Physician's Assistant was coming on duty, he told the Physician's Assistant that he should see the inmate.

---

[11]     There is no statement in the record from Irizzary to indicate that he told Warren that Harold Brown was on the floor, injured, in pain, and unable to get up -- which is the essence of what Brown claims that Irizzary told Warren.

Finally, it is noted that although the plaintiff has stated that he suffered a chipped bone in his elbow [for which there are no supporting medical documents] and apparently has diagnosed back problems, he has not submitted medical evidence in the form of documents or an expert opinion, to demonstrate that the back conditions were the result of the fall. However, even if assuming *arguendo* some of plaintiff's problems did result from the fall, he has not submitted any evidence that, apart from pain suffered due to the fall, any back condition from which he suffered or suffers was in any way exacerbated as a result of the 30 [or 50 minute] delay in notifying medical staff that he had fallen (or stated another way, made worse by not calling immediately for an ambulance to take the plaintiff directly to a hospital without first being seen by prison medical staff.

To prevail on his medical claim under the Eighth Amendment for cruel and unusual punishment, plaintiff Brown must establish not only that there was an excessive risk to his health or safety, but that from the facts of which the defendant Warren was aware it could be inferred that a substantial risk of serious harm existed if he was not transported immediately to the hospital; and finally, Brown must establish that the defendant drew that inference and yet failed to act. Brown has not done so; the required subjective element for an Eighth Amendment deprivation is therefore not satisfied.

The defendant has invoked the affirmative defense of qualified immunity, which protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). When faced with a question of qualified immunity, the Courts pursuant to Saucier v. Katz, 533 U.S. 194, 199-200 (2001) overruled in part by Pearson v. Callahan, 129 S.Ct. 808

24

(2009),[12] have until recently engaged in a two-step analysis: first asking [taking the facts in the light most favorable to the plaintiff/non-movant] whether the official's alleged conduct violated the plaintiff's constitutional rights, and then proceeding, if necessary, to a second question, whether the right was clearly established at the time of the conduct. If the court, addressing the questions in the order set out in Saucier, first determines that no constitutional violation occurred, the inquiry ends there. If, however, the alleged conduct amounts to a constitutional violation, the Court then asks whether the right was clearly established at the time of the conduct.

In this case, where it is concluded that there was no constitutional violation by the defendant Lt. Warren, when construing the facts in the light most favorable to the plaintiff/non-movant Brown, the inquiry ends there, and there is no necessity to reach the second question.

In sum, defendant Warren is entitled to summary judgment, because there is no showing by the plaintiff that Warren was deliberately indifferent [and therefore there was no constitutional violation]; and because the defendant Warren is entitled to qualified immunity.

### IV   CONCLUSION

It is therefore recommended that: 1) the defendant Warren's renewed motion for summary judgment (DE#52) be GRANTED; and 2) this case be Closed.

---

[12]    Following the Supreme Court's opinion in Pearson v. Callahan, 129 S.Ct. 808 (2009), the Saucier two-step analysis is no longer an inflexible progression. Post-Pearson, the courts are now free to answer the second step first.

Objections to this Report may be filed with the District Judge within fourteen days of receipt of a copy of the report.

Dated: January 29<u>th</u>, 2010.

_____
UNITED STATES MAGISTRATE JUDGE

cc: Harold Brown, <u>Pro Se</u>
    Reg. No. 42883-004
    FCI Miami
    P.O. Box 779800
    Miami, FL 33177

    Karin D. Wherry, AUSA
    United States Attorney's Office
    99 N.E. Fourth Street
    Miami, FL 33132